UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA K. BROWN,

        Plaintiff,                                 Civil Action No. 14-13738
                                                    Honorable Marianne O. Battani
v.                                                        Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]

Plaintiff Brenda Brown ("Brown") commenced this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties filed motions for summary judgment, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Brown is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's motion for summary judgment [13] be GRANTED, Brown's motion for summary judgment [11] be DENIED and, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On March 19, 2013, Brown filed the instant applications for DIB and SSI, alleging a disability onset date of March 12, 2013. (Tr. 71-72, 83-84). The claims were initially denied on September 9, 2013. (Tr. 71, 82). Thereafter, Brown filed a timely request for an administrative hearing, which was held on March 31, 2014, before ALJ Regina Sobrino. (Tr. 30-70). Brown, who was represented by non-attorney Brenda Look, testified at the hearing, as did vocational expert Michele D. Robb. (*Id.*). In a written decision dated May 9, 2014, the ALJ determined that Brown is not disabled. (Tr. 11-23). On August 22, 2014, the Appeals Council denied review. (Tr. 1-5). Brown filed for judicial review of the final decision on September 26, 2014. (Doc. #1).

### B.     Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240, at *21 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . [i]f the analysis [then] reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C. Background

#### 1. Disability and Function Reports

In an undated disability report, Brown indicated that she suffers from liver disease, ulcers, asthma, acid reflux, plantar fibroma, panic attacks, and global phobia. (Tr. 199).  Brown reported that she stopped working on March 12, 2013, as a result of these conditions. (*Id.*).  With respect to her education level, Brown completed the tenth grade and pursued para-professional studies as a nursing assistant. (Tr. 200).  Brown was employed in this vocation prior to stopping work. (*Id.*).  During her employment, Brown noted that she would frequently lift over 50 pounds and that the heaviest weight she lifted was approximately 100 pounds. (Tr. 201).  Brown stated that several doctors had treated her for the above physical impairments. (Tr. 202-08).  At the

3

time of the report, Brown was taking multiple medications, including Advair and Xopenex for lung conditions and Zantac and Prilosec for stomach ulcers. (Tr. 202).

In a function report dated May 11, 2013, Brown stated that she lives in a house with her son. (Tr. 223). When asked to describe her daily activities, Brown indicated that she wakes up and "take[s] Prilosec, wait one hour, eat, take Metoprolol Tartrate [*sic*], use nebulizer for breathing, use Advair, lay down for an hour, depending on how I feel I do what I can for daily chores, take Zantac and repeat meds." (Tr. 224). Brown listed her medications, with accompanying side effects, as follows: Tylenol #3 (sleepiness), Xopenex (nervousness), Tramadol (sleepiness), Xanax (sleepiness), Advair (high blood sugar and nervousness). (Tr. 230) When asked to describe the activities she could perform before the onset of her conditions that she can no longer perform, Brown reported that she could no longer "walk a lot, stand for long periods of time, be in small areas, bend a lot, go up and down stairs." (Tr. 224). Her conditions also interfere with her sleep and she would sometimes awaken due to shortness of breath. (*Id.*).

Brown noted that she has no problems with any aspect of personal care (*Id.*). Brown indicated that she spends 20 minutes preparing her daily meals. (Tr. 225). When she does cook, Brown generally makes frozen foods, sandwiches, fruits, and canned food items. (Tr. 225). She reported that she can clean her house and do laundry for short intervals before she needs to rest. (*Id.*). Brown stated that she needs assistance with mowing the lawn, house repairs, and cleaning the areas of her house that require strong cleaners (*i.e.*, kitchen and bathroom). (*Id.*).

Brown is able to drive a car and goes outside depending on her breathing and pain levels. (Tr. 226). She can travel short distances alone but she needs someone to accompany her on longer trips on account of her anxiety. (*Id.*). Brown shops for groceries twice a month although she has difficulty in larger stores because they cause her to have panic attacks. (*Id.*). Brown

4

reported that she is able to pay bills, handle a savings account, and use a checkbook. (*Id.*). Her hobbies include watching television, computer games, and gardening. (Tr. 227). However, Brown indicated that she can no longer garden because of her breathing problems and that she has difficulty focusing on computer games. (*Id.*).

In regards to social activities, Brown reported that she has daily phone conversations and that she receives visitors approximately twice a week. (*Id.*). Her main activities are grocery shopping and going to doctors' appointments. (*Id.*). She indicated that her family life is dysfunctional and that she no longer has much of a social life because of her health issues. (Tr. 228).

When asked to identify functions impacted by her condition, Brown checked lifting, squatting, bending, standing, reaching, walking, kneeling, talking, stair climbing, seeing, completing tasks, concentration, understanding and using her hands. (*Id.*). She can walk 100 yards before she needs to stop to rest her feet and allow her breathing and heart rate to normalize. (Tr. 228). Brown noted that she is able to concentrate depending on her anxiety level; she does not complete tasks; she can follow written instructions so long as she does not have to memorize them; she has difficulty following spoken instructions; she has difficulty in coping with changes in routine; and she does not handle stress well. (Tr. 229). Brown expressed "fears of being far from home, the expressway, [and] medications." (*Id.*). Ultimately, she "avoid[s] a lot of situations due to . . . anxiety and panic attacks." (*Id.*).

  2. *Brown's Testimony*

At the time of the March 31, 2014 hearing before the ALJ, Brown was living alone in her home. (Tr. 31). She testified that she can stand for 20 minutes before she needs to sit down; she can sit for 15 to 30 minutes at a time before she needs to change position; and she suffers from

shortness of breath if she needs to walk from the far end of a parking lot to the front of a store. (Tr. 32-33). Brown reported that she needs to move around because otherwise "my back will start hurting, or, I'll become anxious . . ." (Tr. 33). Before doctors removed her right kidney in January 2014, Brown indicated that she could lift up to 25 pounds. (*Id.*). She stated that she can use her hands or reach for objects. (Tr. 34). She does experience back and abdominal pain when bending at the waist and she suffers from back and knee pain in the crouching position. (Tr. 34-35). Brown attributed her pain to arthritis in her knees, hips, and back. (Tr. 35). For pain relief, Brown indicated that her doctors only prescribed "Norco because of my kidney function." (*Id.*). She also testified that she suffers from shortness of breath when she uses the stairs. (*Id.*).

As for household activities, Brown reported that she must take breaks in between chores and that she cannot perform yard work. (Tr. 35-36). She is able to go shopping for groceries without assistance and she can bath and dress herself. (*Id.*). Brown indicated that driving is difficult for her because she experiences agoraphobia when she travels longer distances from home. (Tr. 36). She stated that her mother usually accompanies her on these longer trips. (*Id.*). In addition, Brown stated that she suffers from panic attacks that have worsened "over the last couple of years." (Tr. 46).

With respect to medications, Brown testified that doctors prescribed her Prilosec, Metoprolol, Zantec, Norco, Xanax, Spirica, Symbicort, Xenopex (a rescue inhaler), Lamictal (for kidney function), and Claritin. (Tr. 37). Brown reported that, at the time of the hearing, she had recently been prescribed two liters of oxygen for use while sleeping and resting. (Tr. 38). The side effects of the above medicines are constipation, drowsiness, and occasional anxiousness. (*Id.*). Brown stated that she smokes a pack of cigarettes a day to counter the anxiety, although one of her doctors "is trying to work with me to get me to quit . . ." (*Id.*). Brown also indicated

6

that she had been hospitalized in January 2014 for the removal of her kidney and that she had gone to the emergency room for breathing problems related to influenza. (Tr. 40-41).

Brown testified that she worked as a full-time nursing assistant but had to switch her schedule to part-time work because she could no longer lift her patients. (Tr. 43). Brown noted that she began to suffer from kidney stones in 2007 and that she eventually stopped working altogether on March 12, 2013, because her kidney function and breathing began to deteriorate. (Tr. 44). She stated that she currently takes one or two Norco pills a day to alleviate her arthritis pain. (Tr. 49). Brown indicated that she cannot walk for more than ten consecutive minutes before resting; she must rest for 15 to 20 minute intervals; she can only ascend stairs with difficulty; and that carrying groceries "usually requires a couple of breaks." (Tr. 49-50). Brown reported that "[i]t takes me pretty much all day to do my housework." (Tr. 51). She cannot vacuum an entire room without resting; she needs two breaks in order to wash all of her dishes; and she typically cooks one meal a day to avoid standing for prolonged periods of time. (*Id.*).

### 3. Medical Evidence

The Court has thoroughly reviewed the record, and will discuss the relevant medical evidence within the analysis portion of this Report and Recommendation.

### 4. Vocational Expert's Testimony

Michele D. Robb testified as an independent vocational expert ("VE"). (Tr. 58-63). The ALJ asked the VE several hypotheticals, which were progressively more restrictive. (Tr. 59-61). First, the ALJ asked the VE to imagine a claimant of Brown's age, education, and work experience, who was limited to light work; unable to climb ladders, ropes, or scaffolds; only occasionally able to climb stairs, stoop, kneel or crouch; unable to crawl; should avoid moderate exposure to pulmonary irritants; should not be exposed to extremes of temperature or humidity;

7

should not drive as a work duty; limited to simple, routine, repetitive work that is not production paced (no assembly line work); should be subject to minimal changes in the work setting; should not be required to interact with the public, and contacts with co-workers and supervisors should be occasional and routine. (Tr. 59). The VE testified that the hypothetical individual would be unable to perform Brown's past relevant work as a nursing assistant, but could perform (at the light unskilled level) the positions of general office clerk (120,000 jobs nationwide); mail clerk (62,000 jobs nationwide); and packer (92,000 jobs nationwide). (Tr. 59-60). The ALJ then inquired as to the availability of sedentary level jobs for an individual with the above limitations. (Tr. 60) The VE responded that such an individual could work as a general office clerk (110,000 jobs nationwide); bench assembler (28,000 jobs nationwide); and packer (42,000 nationwide). (*Id.*). The ALJ then asked whether the hypothetical individual would be able to alternate positions for up to five minutes approximately every 20 minutes (*Id.*). With this limitation, the VE testified that the hypothetical individual would be able to perform all of the above sedentary work level jobs, although the available jobs at the light work level would be reduced by 50 percent for the general office clerk position and 75 percent for the packer position. (*Id.*). The VE also noted that such positions require "no more than one absence per month on average." (Tr. 61). The ALJ then asked whether any part of the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). (*Id.*). The VE stated that her testimony regarding the alternation of sitting and standing "was not contemplated by the DOT," but was rather "based on [her] experience" in job placement. (*Id.*).

Responding to the examination of Brown's non-attorney representative, the VE attested that a hypothetical individual would be precluded from work if she exhibited significant anxiety that would cause her to be off-task more than 25 percent of workday. (*Id.*). At most, such an

8

individual could not be off-task for more than 10 percent of the workday. (Tr. 63).

> **D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Brown is not disabled under the Act. At Step One, the ALJ found that Brown had not engaged in substantial gainful activity from the alleged onset date of March 12, 2013. (Tr. 13). At Step Two, the ALJ found that Brown has the severe impairments of chronic obstructive pulmonary disease ("COPD"), chronic kidney disease, obesity, depression and "anxiety with possible bipolar disorder." (*Id.*). At Step Three, the ALJ found that Brown's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 16). The ALJ then assessed Brown's residual functional capacity ("RFC"), concluding that she is capable of performing light work with the following limitations: "the claimant should not climb ropes, ladders, or scaffolding; she is limited to occasional climbing of stairs, crouching, and stooping, and should not be required to crawl; the claimant should avoid even moderate exposure to pulmonary irritants; she should not be exposed to extremes of temperature or humidity; the claimant is limited to simple, routine, repetitive tasks not performed at a production rate pace (e.g., no assembly line work), with minimal changes in the work setting; and the work should not require interaction with the public or more than occasional, routine contacts with supervisors and coworkers." (Tr. 18).

At Step Four, the ALJ determined that Brown is unable to perform any past relevant work. (Tr. 21). At Step Five, based in part on the VE's testimony, the ALJ concluded that Brown is capable of performing a significant number of jobs that exist in the national economy. (Tr. 22-23). As a result, the ALJ concluded that Brown is not disabled under the Act. (Tr. 22).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Brown v. Sec'y of Health &*

*Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (stating that "an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

Brown's sole argument on appeal is that the ALJ erred by failing to afford controlling weight to the opinions of her treating psychiatrist. (Doc. #11 at 11-12). For the reasons discussed below, Brown's argument lacks merit.

Social Security regulations require ALJs to give treating source opinions controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" – such weight is only appropriate if the opinion is well-supported and consistent with the record as a whole. Social Security Ruling 96-2p, 1996 SSR LEXIS 9, at *5 (Jul. 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (stating that "[t]reating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (requiring the ALJ to provide "good reasons" for the weight the given to treating source opinions).

In this case, Brown's treating psychiatrist, Duncan Magoon, M.D., initially evaluated her on December 20, 2013. (Tr. 477-82). Brown related that she suffered from racing thoughts, mood shifts, irritability, insomnia and a history of manic post-partum depression. (Tr. 479). Dr. Magoon assigned Brown a Global Assessment of Functioning Score ("GAF")[1] of 48 and diagnosed her with post-traumatic stress disorder, major depressive disorder (moderate), and bipolar disorder. (Tr. 481). On March 27, 2014, Dr. Magoon performed a mental RFC assessment. (Tr. 550-51). Therein, he again diagnosed Brown with bipolar disorder, depression and post-traumatic stress syndrome. (Tr. 551). The doctor found that Brown had marked limitations in most work-related categories such as understanding and remembering detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary

---

[1] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 436 n.1 (6th Cir. 2012) (citations omitted).

tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to sustain an ordinary routine without specialized supervision; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). In her written decision, the ALJ considered this medical opinion and properly accorded it little weight. (Tr. 21).

First, the ALJ weighed the brief duration of the treatment relationship. A review of the documentary evidence in the record demonstrates that Dr. Magoon initially examined Brown in December 2013 (Tr. 480-82), and according to her own testimony, he at most saw her on two other occasions before drafting the above RFC assessment in March 2014. (Tr. 56). *See Kepke v. Comm'r Soc. Sec.*, No. 13-13944, 2014 U.S. Dist. LEXIS 181087, at *26-28 (E.D. Mich. Sep. 17, 2014) (rejecting the opinion of treating psychiatrist in part because of the three-month duration of the treatment relationship).

Second, the ALJ reviewed the treatment notes from Donald Robinson, M.D., Brown's primary care physician with whom she had a longer treating relationship, and found that they were inconsistent with Dr. Magoon's findings. (Tr. 21). The record demonstrates that although Brown exhibited a depressed affect and complained of depression at her first visit with Dr. Robinson on March 14, 2013, she denied any "sense of great danger, anxiety" or any other "mental problems" at that time. (Tr. 391). Dr. Robinson's records indicate that, over the course of approximately one year, Brown reported that she no longer suffered from depression, she denied having any difficulty with concentration, and disclaimed any thoughts of anxiety or other mental issues. (Tr. 399, 406-07, 570, 575, 579, 584, 588, 597-98, 608-09, 613). Moreover,

Brown was generally alert, with a normal mood and affect, and demonstrated normal attention span and concentration. (*Id.*). On only one visit had Dr. Robinson observed that Brown presented with a "depressed affect" and was "anxious."[2] (Tr. 593).

Third, Dr. Magoon's mental RFC assessment was inconsistent with the other objective medical evidence in the record. For example, during her September 30, 2013 psychiatric evaluation, Leslie MacAuley, M.D., reported that Brown did not exhibit acute distress; she was alert and oriented; and her affect was "appropriate." (Tr. 486). Although Dr. MacAuley noted that Brown "has some dysphoria due to anxiety" and a "history of panic attacks," she was not currently subject to "overt panic attacks" and the doctor found that "[h]er insight and judgment are adequate at this time." (*Id.*). Dr. MacAuley diagnosed Brown with post-traumatic stress disorder and major depressive disorder (recurrent, moderate) and assigned her a GAF of 55. (Tr. 489). Similarly, R. Scott Lazzara, M.D., performed a consultative examination of Brown on August 8, 2013. (Tr. 442-47), which revealed that Brown had the ability to follow commands; she displayed normal concentration levels; her insight and judgment were appropriate; and her mental status was "normal." (Tr. 443).

Finally, the Court rejects Brown's argument that the ALJ should have given more weight to Dr. Magoon's mental RFC assessment simply because she gave little weight to the contrary opinion of the state agency psychologist, Rom Kriauciunas, Ph.D., who found that Brown had mild limitations in social functioning and concentration persistence or pace. (Tr. 16, 77, 89). Brown errs by assuming that the ALJ could only either (1) credit Dr. Magoon's mental RFC

---

[2] In addition, contrary to Brown's contention, Dr. Robinson's lack of psychiatric expertise does not undermine the validity of his medical conclusions or observations as her treating source physician. The specialty of a treating physician is but one of a several factors to be considered in evaluating medical opinion evidence, including the length, nature and extent of the treatment relationship and the frequency of examination. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

assessment and reject Dr. Kriauciunas's conclusions, or (2) accept Dr. Kriauciunas's opinion and reject Dr. Magoon's mental RFC assessment. No such formulaic restriction is imposed on an ALJ. Rather, the ALJ's job is to weigh each medical opinion under the relevant factors, and give each the weight it deserves. Here, the ALJ permissibly opted to afford little weight to both of the opinions – a decision which worked in Brown's favor with respect to Dr. Kriauciuna's opinion – as she found that the objective medical evidence supported more stringent limitations than those adopted by Dr. Kriauciunas, but less severe than those Dr. Magoon identified. (Tr. 16, 21). *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 390 (stating that "[t]reating physicians' opinions are only given such deference when supported by objective medical evidence."); *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 177 (6th Cir. 2009) (noting that "this Court has recognized that consultative opinions may be credited where they are supported by the record."). The Court agrees with the Commissioner's assessment that the ALJ "in essence, partially credited plaintiff's allegation of disability, finding that the record supported more functional restrictions than Dr. Kriauciunas identified, but not restrictions to the extent that Dr. Magoon opined." [13 at 13].

Therefore, since Dr. Robinson had the opportunity to observe and treat Brown on more than ten occasions throughout almost a one-year period, and since these observations are consistent with significant objective medical evidence in the record, the ALJ appropriately discounted Dr. Magoon's mental RFC assessment.[3] *See* 20 C.F.R. §§ 404.1527(d)(2),

---

[3] Brown insists that "the ALJ should be instructed to obtain full records from Dr. Magoon, so that an analysis of his findings can be rendered which is supported by substantial evidence." [11 at 17]. Although Brown's non-attorney representative informed the ALJ of the possibility that Dr. Magoon had not fully responded to Brown's medical records request (Tr. 56-57), notably, the representative did not ask the ALJ to leave the record open so that she could obtain any outstanding records. Moreover, the ALJ had the opportunity to review Dr. Magoon's mental RFC assessment, dated merely four days before the hearing, which would have post-dated any of

15

416.927(d)(2).

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's motion for summary judgment [13] be GRANTED, Brown's motion for summary judgment [11] be DENIED, and the Commissioner's decision be AFFIRMED.

Dated: November 24, 2015        s/David R. Grand
Ann Arbor, Michigan             DAVID R. GRAND
                                United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

---

the requested treatment records and contained the doctor's most recent medical assessment of Brown's mental limitations. Consequently, the Court sees no reason to depart from the general rule that "the claimant is responsible for furnishing the medical and other evidence supporting her application for benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 24, 2015.

                                            s/Eddrey O. Butts
                                            EDDREY O. BUTTS
                                            Case Manager